**FOUNDERS' INSURANCE COMPANY,**
a corporation, Appellant,

v.

**H. J. ROGERS and R. G. Rogers,**
Appellees.

No. 16656.

United States Court of Appeals
Ninth Circuit.
July 29, 1960.

Philip K. Verlegar, Jack T. Swafford, Howard J. Privett, McCutchen, Black,

Harnagel & Shea, Los Angeles, Cal., for appellant.

Richard G. Harris, Los Angeles, Cal., for appellees.

Before CHAMBERS, Chief Judge, and JERTBERG and KOELSCH, Circuit Judges.

JERTBERG, Circuit Judge.

This appeal is from a final decree in admiralty of the district court which adjudged that appellees recover from the appellant, which had issued a policy of marine insurance covering a small boat called the Adequate, and owned by appellees, the sum of $3,500 for damages sustained to the boat when it sank at its slip.

Jurisdiction of the district court was invoked under the provisions of the constitutional grant of admiralty and maritime jurisdiction (Article 3, Section 2 of the Constitution of the United States), and Title 28 U.S.C.A. § 1333(1). This Court's jurisdiction to review said decree rests upon Title 28 U.S.C.A. §§ 1291 and 1294.

In their libel in personam filed by the appellees against the appellant the right to recover was predicated upon either of two provisions of the insurance contract covering the boat. One of these provisions, referred to as the "perils" clause provides for coverage in the event of a loss caused by certain specified perils, including the "perils of the seas". The pertinent portion of this provision is as follows:

"This insurance shall apply to loss or damage resulting from perils of the seas, fire, assailing thieves (meaning only theft with visible evidence of forcible entry or removal), theft of the insured vessel, jettisons, barratry of the Master and Mariners, aircraft (including articles falling therefrom), collision, and all other like perils, losses, or misfortunes."

The policy issued has an "English Law" clause, which provides "This insurance is subject to English Law and Usage."

The other provision of the policy of insurance is the "Inchmaree" clause, which in pertinent part provides:

"E. Inchmaree Clause (negligence, latent defect) * * * This insurance shall apply to loss of or damage to the vessel, its equipment or machinery directly caused by:

* * * * * *

"4. Negligence of Master, mariners, engineers or pilots;

provided such loss or damage has not resulted from want of due diligence by the Assured, the owners of the vessel, or any of them, or by the Manager. Within the meaning of this clause the 'assured', the 'owners' or 'Managers' shall not be considered as 'Masters', 'mariners', 'engineers' or 'pilots'."

After trial of the cause the district court made and entered findings of fact, portions of which relevant to this appeal are:

"6. That on or about January 9, 1957, the Adequate sank at her slip at Lido Isle, Newport Beach, California.

"7. That the sinking was caused by water entering the hull through holes in that portion of the starboard exhaust line extending from the muffler to the transom of the vessel.

"8. That said holes in the starboard exhaust line of the Adequate had existed for some time prior to the sinking that a slight change in the vessel's trim allowed entry of the water into the hull through said holes.

"9. That Charles Smith was Master of the Adequate, and it was his duty to operate and maintain her, after Labor Day, 1956, to the same extent as prior thereto.

"10. That said Charles Smith was negligent while he was the Master of the Adequate: (a) in having failed to inspect the exhaust lines to determine whether they required replacement due to deterioration

from sulphuric acid corrosion, and in having failed to advise libelant, H. J. Rogers, of the need for conducting such an inspection; (b) in having failed to take steps which would have prevented the entry of water into the exhaust lines of the Adequate after Labor Day, 1956, and in having failed to advise libelant, H. J. Rogers, of the need for so protecting the Adequate; and (c) in having failed to inspect the Adequate with either sufficient frequency or thoroughness after Labor Day, 1956, and in having failed to advise libelant, H. J. Rogers, of the frequency or thoroughness of the inspections required.

"11. That said negligence directly and proximately caused said sinking.

"12. That there was no want of due diligence on the part of libelants and libelant, H. J. Rogers, at no time held himself out as an experienced mariner, and at all times, reasonably and without any negligence on his part, completely relied upon Charles Smith to operate, maintain, and act as Master of the Adequate."

There is no finding of fact that the sinking of the Adequate was in any manner caused or contributed to by any of the perils insured against under the "perils" clause. In fact, finding No. 11 supra states that "said negligence [the negligence of Smith while he was master of the Adequate] directly and proximately caused said sinking."

The conclusions of law state simply that the appellees are entitled to judgment against appellant in the sum of $3,500, and that the decree be entered accordingly.

The appellant's statement of points on appeal and points on which it relies on this appeal are:

(1) The findings of fact numbers 9, 10, 11 and 12 are erroneous, and that each such finding is contrary to the undisputed evidence;

(2) The trial court erred in failing to find as a matter of law that Charles Smith was not the "Master" of the Adequate after Labor Day, 1956, as that term is used in the Inchmaree clause of the subject policy of insurance;

(3) The district court erred in failing to find as a matter of law that the sinking of the Adequate resulted from a want of due diligence on the part of appellees;

(4) The district court committed substantial and prejudicial errors of law in rendering its judgment for appellees and against appellant on the theory that the loss complained of was within the coverage of the "perils" clause of the policy;

(5) The district court committed substantial and prejudicial errors of law in rendering its judgment for appellee on the theory that the loss complained of was within the Inchmaree clause of the subject policy; and

(6) The judgment of the district court is not supported by the evidence.

Since the final decree was in no wise predicated upon the "perils" clause of the insurance contract, we will not spend any time in this opinion in discussing appellant's points relating to the "perils" clause; neither will we discuss the arguments made by counsel in the briefs nor the many authorities which have been cited relating thereto.

In discussing the remaining points on appeal of the appellant, it is to be borne in mind that the appellees were the prevailing parties below; that all issues of fact were resolved adversely to appellant, and that appellees are entitled to the benefit of all favorable inferences from the facts proved relative to the issue of liability. Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial judge to judge of the credibility of witnesses. Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A.

We now proceed to set out the facts which were before the district court. In doing so, we must view the evidence in

the light most favorable to the prevailing party.

Appellees, H. J. Rogers and his wife, purchased the Adequate in 1955, and employed one Charles A. Smith as master of the vessel at a salary of $400 per month. The Adequate is a thirty-one foot Chriscraft pleasure cruiser. Smith's pay for acting as master was made by checks drawn by Barnes & Rogers, Inc., a corporation in which the appellee Rogers owned a half interest. As master of the Adequate, Smith had authority to make any and all necessary repairs to the boat, although he usually mentioned major repairs to appellee Rogers. The Adequate was used primarily for weekend fishing trips in the summer. Appellee Rogers relied completely on Smith for maintenance and operation of the boat, characterizing himself as a "Sunday Skipper" and conceding that he didn't even know how to start the vessel's engines. During the summer of 1956 one of the exhaust lines running from the exhaust manifold to the muffler blew out, and Smith at that time told Rogers of that fact. At no time, however, did Smith inform Rogers that the exhaust line from the muffler to the transom was thin or in any sort of danger or in need of replacement. Smith at that time decided to eventually replace the copper exhaust lines running from the muffler to the transom with neoprene hose, but this was never done prior to the sinking.

On or about Labor Day of 1956, the vessel was tied up for the winter, stern out, in a slip at a private pier in front of appellee Rogers' home at Newport Beach, California, and was not taken out again in the intervening four months prior to the sinking. At the time of the last trip, on or about Labor Day, 1956, appellee Rogers offered Smith a job as a full time dispatcher for a corporation in which Rogers owned a half interest, and Smith accepted the new position. No discussion was had with reference to what, if any, continuing duties Smith would have in connection with the Adequate. Smith testified as follows concerning this conversation:

"Q. Will you tell the court, please, what discussion you had with Mr. Rogers about what your employment would be from Labor Day 1956 forward? A. Well, on our last trip out, which I think was Labor Day or before that, he asked me if I would be willing to take over as a dispatcher at the plant, at the Barnes and Rogers.

"Q. And you agreed to do that? A. Yes, sir.

"Q. Now, did you have any discussion at that time about what your continuing duties should be, if any, in connection with the Adequate? A. No, sir.

"Q. You didn't have any at all? A. No, sir."

Rogers had no recollection at all of what was said during this conversation concerning any continuing duties of Smith aboard the Adequate.

Smith was never given any instructions or orders after Labor Day to check the boat or to be at the boat at any particular time, testifying as follows:

"Q. Did he discuss with you at all that you should spend any hours —strike that. Did he direct that you spend any hours per week on the Adequate? A. No, sir.

"Q. Did he instruct you that you spend any hours per week on the Adequate? A. No, sir."

Rogers testified to the same lack of orders to be at the boat at any specified times:

"Q. Did he have any duties to perform as a skipper, unless you particularly asked him? A. Well, as he testified, he came down and checked the boat twice a week.

"Q. And did you instruct him to do that? A. No, sir.

"Q. He did that just voluntarily? A. Right, sir.

"Q. And not at your request? A. No, sir.

*     *     *     *     *     *

"Q. What hours was he supposed to be, according to your orders, down at the boat? A. He had no orders from me to be at the boat.

"Q. He had no orders from you to be at the boat? A. No, sir."

Subsequent to Labor Day, 1956, Smith visited the Adequate at least twice a week in the morning before going to work at the plant of Barnes & Rogers, where he worked a five and one-half day week, although he admitted that his semi-weekly inspections were often limited to ten or fifteen minutes duration. At no time, however, did he undertake any major repair work or major inspection aboard the Adequate, and never started the engines. He would check the bilges on these inspection trips, but he did not go down into the engine compartment to check the exhaust lines. The last inspection was made on or about January 1, 1957, and nothing unusual was noticed. When Smith would occasionally find water in the bilges, he attributed it to leaking through the propeller shaft opening, and would pump it out with the electric bilge pump. Smith's own view of the nature of his duties in respect to the Adequate was as follows:

"Well, being in the employment of Mr. Rogers, I still felt it was my duty to check the boat when the chance—what chance I could do it and also work at the plant."

As for the exhaust ports, at the time the Adequate was laid up Smith stuffed rags in them, and at that time decided to get wooden plugs to use to close the openings. Although he could easily have had such plugs made by local boat yards, he did not do so. Two marine surveyors who testified were of the view that had such plugs been placed in the exhaust ports, the vessel would not have sunk. Smith did not check the rags each time that he inspected the boat, but at the times that he did check them he would often find them wet. He testified, however, that at no time when he checked the exhaust ports was the starboard exhaust port below the water line.

The sinking of the Adequate occurred solely by reason of the incursion of sea water into the boat through three holes in the starboard exhaust line which extended from the starboard side of the muffler to the transom. These holes were the result of corrosion, which in turn was the result of burning motor fuel containing sulphur. These holes had existed in the starboard exhaust line for some time prior to the sinking, and there was a slight change in the boat's trim which permitted entry of water into the hull through these holes. Expert testimony established that the reliable life of copper exhaust lines used under such circumstances as existed in this case was from one to two years duration, and that failure of such copper exhaust lines due to the corrosive properties of sulphurous and sulphuric acid formed by the burning of gasoline motor fuel is a fairly common occurrence in pleasure boating.

Appellee Rogers did not make any inspection of the Adequate or even go aboard her from Labor Day until the sinking. He did not specifically check on Smith to see what he was doing aboard or about the boat, although he was aware of the semi-weekly inspections of Smith.

On January 5, 1957, four days before the sinking, Smith was fired by Rogers from his job as a dispatcher at the Barnes & Rogers plant, but nothing was said about the Adequate or Smith's future relationship thereto. Smith's final pay check from Barnes & Rogers covered the period up to and including January 15, 1957.

In light of the foregoing the trial court found that Smith was master of the Adequate and "it was his duty to operate and maintain her, after Labor Day, 1956, to the same extent as prior thereto"; that Smith was negligent while he was master of the Adequate (a) in having failed to inspect the exhaust lines to determine whether they required replacement due to deterioration from sulphuric acid corrosion, and in having failed to advise Rogers of the need for conducting such inspection; (b) in having failed to take steps which would have prevented the

entry of water into the exhaust lines after Labor Day, 1956, and in having failed to advise Rogers of the need for so protecting the Adequate; (c) in having failed to inspect the Adequate with either sufficient frequency or thoroughness after Labor Day, 1956, and in having failed to advise Rogers of the thoroughness or frequency of the inspections required; that said negligence directly and proximately caused the sinking; and that there was no want of due diligence on the part of Rogers, who, at all times reasonably and without any negligence on his part, completely relied upon Smith to operate, maintain, and act as master of the Adequate. Accordingly, the trial court allowed recovery for the stipulated damages under the Inchmaree clause of the policy of insurance.

■ On this appeal, appellant does not challenge the finding that Smith was negligent, but urges that the findings of fact that Smith was master of the Adequate after Labor Day 1956, and that the loss did not result from want of due diligence by Rogers during the period after Labor Day 1956 until the sinking of the vessel, are both clearly erroneous under Rule 52(a) of the Federal Rules of Civil Procedure. That principle of review is applicable to admiralty cases, McAllister v. United States, 1954, 348 U.S. 19, 20, 75 S.Ct. 6, 99 L.Ed. 20. Hence the issues presented for our review are the narrow ones of the sufficiency of proof to support the findings of fact and the conclusions of law which impose liability on appellant under the insurance contract.

■ The first question we will consider is whether there is sufficient proof in the record to support the finding that Smith was master of the Adequate within the meaning of that term as it is employed in the Inchmaree clause, after Labor Day of 1956. In support of such finding, appellees urge that both parties to the relationship denominated it as a master status, and that we are bound by their conclusion. It is true that Smith testified that he thought the caring for the Adequate after Labor Day 1956 was

his primary responsibility, although as previously noted Smith testified that Rogers said nothing to him about looking after the Adequate. It is also true that Rogers insisted that Smith was master of the Adequate until he was fired on January 5, 1957. It is not, however, what the parties call a relationship which determines the legal nature of that relationship. Rather, it is what a party does or is authorized to do which determines the status. Warner Co. v. Norton, 3 Cir., 1943, 137 F.2d 57, affirmed 1944, 321 U.S. 565, 64 S.Ct. 747, 88 L.Ed. 931. The declarations of Smith and Rogers concerning the capacity in which Smith was employed after Labor Day are but naked conclusions and are not evidence to be considered by the trial court. Hence we turn to a review of what was said and done by Smith and Rogers.

Considering first what was said and not said, we are confronted by a record which discloses that there was no discussion between Smith and Rogers as to any duties to be performed by Smith after Labor Day in connection with the Adequate. The proof is clear that Smith was never directed or told to even check the boat after it had been placed in winter storage. After Labor Day Smith worked as a full time dispatcher for Barnes & Rogers. From Smith's testimony it appears the job was so time-consuming that he was prevented from having wooden plugs made for the exhaust ports or doing any type of repair work on the Adequate. His inspections were on no specific time schedule and were so brief he never once bothered to look closely at the exhaust lines or start the boat's engines. From our study of the record we are compelled to the conclusion that Smith was acting as a volunteer in making his cursory, semi-weekly inspections, because "being in the employment of Mr. Rogers," he felt that it was the politic thing to do in so far as he could do it and still work at the plant. Under the record, Smith was nothing more than a voluntary caretaker of the boat after Labor Day 1956. Thus, on this phase of the case we are presented with the

question as to whether Smith as a voluntary caretaker of the boat after Labor Day 1956 was the master of the vessel during that period. Appellant relies on four recent American cases interpreting the master provision of the Inchmaree clause, and although they are helpful in the resolution of the case, none of them raises the precise issue posed by the instant case. The cited cases are divided into two separate categories.

In the first group, the negligent party was admittedly the master of a vessel within the terms of the Inchmaree clause, but recovery for loss was denied because the admitted master was not acting as such when he caused the loss. Such a case is the Yacht Buccaneer, 1940 A.M.C. 1397 (Arbitration at Chicago, 1940). In that case, claim was made by the assured because of the buckling of davits in handling a new tender, which the vessel's master had erroneously concluded could be safely hoisted aboard the vessel. There was no negligence in the handling of the hoisting operation. The arbitrator held that the negligence contemplated by the Inchmaree clause is limited to the failure to properly perform those duties ordinarily required of a master, or bearing some reasonable relation thereto. The arbitrator's view was that the master's activities in surveying, inspecting and determining the suitability of the new tender for the vessel had no connection whatsoever with his duties in his professional capacity as master of the Buccaneer. Accordingly, recovery for the damage to the Buccaneer was not allowed under the Inchmaree clause.[1] This case is no help to the appellant, however, because it assumes the very point with which appellant takes issue— namely, that Smith was the master of the Adequate after Labor Day.

The second group of cases provides more help because the question of the master status of the negligent party was litigated in each one of them. In Read v. Agricultural Ins. Co., 1935, 219 Wis. 580, 263 N.W. 632, 1936 A.M.C. 25, the facts indicate that the assured delivered his yacht to a boat company for winter storage, and later in the spring made arrangements to have the boat reconditioned. The assured had no control over the performance of the work. When the boat was eventually launched, due to the neglect of the boat yard, water was permitted to flow freely into the hull, causing the boat to become partly submerged. The assured sought recovery on the basis of the Inchmaree clause, but the court held that the insurance company was not liable for the loss. A clear distinction was drawn between the negligence of the independent contractors, which was not covered by the Inchmaree clause, and negligence of the "master or other officer acting professionally in the handling of the vessel at sea."[2]

In Wigle v. Aetna Casualty & Surety Co., D.C.E.D.Mich.1959, 177 F.Supp. 932, 1959 A.M.C. 2270, it appeared that one Ed Clear was an auto parts salesman, known to have had considerable experience with marine engines, having winterized a number of them over a period of years. He was a friend of the assured and spent much time with the assured on his boat. On Saturday, January 19, 1957, the assured and Clear, along with other friends, did some work aboard the assured's boat, and because of Clear's negligence in leaving a sea cock open after working on the engine, the boat sank some days later. The court held that the Inchmaree clause does not cover losses caused by friends of the owner-assured in working on his boat. Hence, the rule appears well settled that the assured cannot invoke the Inchmaree clause to cover losses negligently caused either by independent contractors or by friends

---

1. But see the criticism of this assertedly narrow holding in Footnote 8 of Saskatchewan Government Ins. Office v. Spot Pack, 5 Cir., 1957, 242 F.2d 385, 1957 A.M.C. 655.

2. See also Baggaley v. Aetna Ins. Co., 7 Cir., 1940, 111 F.2d 134, 1940 A.M.C. 583, for a similar holding that an independent contractor employed to do overhaul work on an assured's boat is not a "master" or "engineer" within the terms of the Inchmaree clause.

working aboard his boat. It is clear in the instant case, however, Smith was not acting in the capacity of an independent contractor when he performed his post Labor Day inspections aboard the Adequate. Whether he was prompted to do so out of friendship for Rogers or out of gratitude to Rogers for having given him full time employment as dispatcher, the fact remains that such services were voluntarily performed and did not arise out of any status as master of the Adequate within the meaning of that term as it is employed in the Inchmaree clause. Furthermore, the activities of Smith in relation to the Adequate after Labor Day, 1956, do not approach the type of work normally expected of a paid master acting professionally in the maintenance and operation of a vessel.

There is ample proof in the record to support the finding of fact that Smith was the master of the Adequate within the meaning of the Inchmaree clause from the commencement of his employment up to and including the winterizing of the vessel on or about Labor Day 1956. Furthermore, there is sufficient proof in the record to support the finding that Smith as master was negligent in the winterizing of the vessel, and that he as master was negligent in the performance of his duties as master from at least sometime in the early part of the summer of 1956. There is sufficient proof in the record that the negligent acts or omissions of Smith as master were operative at the time the vessel sank on January 9, 1957.

The finding of the trial court [finding of fact No. 9 supra] that Smith was master of the vessel after Labor Day 1956 finds no support in the record, is clearly erroneous, and cannot stand. The findings of fact contained in finding No. 10 supra, which find acts or omissions of

negligence on the part of Smith both before and after Labor Day 1956; finding No. 11 supra, which finds that said negligence [both before and after Labor Day 1956] directly and proximately caused the sinking of the vessel; and finding of fact No. 12 supra, that the sinking of the vessel did not result from any want of due diligence on the part of Rogers, who at all times reasonably and without negligence on his part completely relied upon Smith to "operate, maintain and act as master of the Adequate", are predicated in part upon the finding [finding No. 9] that Smith was master both before and after Labor Day 1956. To the extent that such findings are predicated upon the clearly erroneous finding that Smith was master of the Adequate after Labor Day 1956, it necessarily follows that such findings to such extent are likewise clearly erroneous and cannot stand.

Were we to affirm the decree below, the failure of the trial court to make a finding of fact as to whether or not the loss or damage resulted from any of the perils insured against under the "perils" clause of the insurance contract would be immaterial. In view of our conclusion that the decree must be vacated the parties are entitled to a finding of fact on this material issue which was created by the pleadings. Such finding is required by Admiralty Rule 46½, Title 28 U.S.C.A.[3] On this subject see Kelley v. Everglades Drainage Dist., 319 U.S. 416, at pages 421 and 422, 63 S.Ct. 1141, at page 1145, 87 L.Ed. 1485; also Victory Towing Co., Inc. v. Bordelon, 5 Cir., 1955, 219 F.2d 540.

The effect of our determination that the finding of fact of the trial court that Smith was master of the vessel after Labor Day 1956 is erroneous and cannot stand is that the Adequate was without

3. "Rule 46½. Findings of fact and conclusions of law
"In deciding cases of admiralty and maritime jurisdiction the court of first instance shall find the facts specially and state separately its conclusions of law thereon; and its findings and conclusions

shall be entered of record and, if an appeal is taken from the decree, shall be included by the clerk in the record which is certified to the appellate court under rule 49. Added June 2, 1930, eff. Oct. 1, 1930."

a master after Labor Day 1956 upon whom Rogers might be entitled to rely. The result is that there is no finding of fact as to the presence or absence of due diligence on the part of Rogers after Labor Day 1956 during the period when the Adequate was without a master. Such a finding should be made.

The decree is accordingly vacated and the cause remanded to the district court for further proceedings consistent with the views herein expressed, including the taking of additional evidence, if necessary, and the making of appropriate findings and conclusions and the entry of a decree based thereon.

Taxation of the costs of this appeal is postponed pending action of the district court on such remand.

Vacated and remanded.